IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA     :
:
        v.                  :  CRIMINAL ACTION NO.
:  1:10-CR-083-ODE-CCH
CARLOS LAUREANO-CASTELLON  :

**ORDER FOR SERVICE OF REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation of the United States Magistrate Judge in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Criminal Local Rules 12.1(E) and 58.1(A)(3).

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the Report and Recommendation within fourteen (14) days of service of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court. If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court and

any appellate review of factual findings will be limited to a plain error review.  United States v. Slay, 714 F.2d 1093 (11th Cir. 1983).

Pursuant to 18 U.S.C. 3161(h)(1)(D), the above referenced fourteen (14) days allowed for filing objections are **EXCLUDED** from the computation of time under the Speedy Trial Act.  At the end of such fourteen-day period, if there are no objections,  the Clerk is **DIRECTED** to submit this Report and Recommendation to the District Judge.  If there are objections, the other party or parties shall have fourteen (14) days from the filing of those objections to respond, and that fourteen-day period shall also be **EXCLUDED** from the computation of time under the Speedy Trial Act. Thereafter, the Report and Recommendation along with any objections and responses shall be submitted to the District Judge.

After such submission of this Report and Recommendation, whether or not objected to, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time under the Speedy Trial Act the time, up to thirty (30) days, that this Report and Recommendation is under advisement before the District Court.  Henderson v. United States, 476 U.S. 321, 331 (1986) (the Speedy Trial Act "exclude[s] all time that is consumed in placing the trial court in a position to dispose of a motion.); United States

2

v. Mers, 701 F. 2d 1321, 1337 (11th Cir. 1983) ("[T]he magistrate and the district court have thirty days each during which to take pretrial motions under advisement.").

IT IS SO ORDERED this 23rd day of December, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA        :
                                :
            v.                  :    CRIMINAL ACTION NO.
                                :    1:10-CR-083-ODE-CCH
CARLOS LAUREANO-CASTELLON  :


**<u>REPORT AND RECOMMENDATION</u>**


Defendant has been charged in a four count indictment alleging that he conspired with others to, and did, knowingly and intentionally: import methamphetamine from Mexico into the United States, and possess methamphetamine in the Northern District of Georgia with the intent to distribute it.

This action is before the Court on Defendant's Reinstated Motion to Suppress Statements [17] (the "Motion"). The key contention of the Motion is that Defendant was subjected to an illegal strip search when he entered the United States at the Atlanta Hartsfield-Jackson International Airport (hereinafter the "Atlanta Airport") on January 24, 2010. That illegal search, argues Defendant, tainted his subsequent inculpatory statements so as to require their suppression. In addition, Defendant

argues that he was so intimidated by the strip search that his statements were involuntarily, and therefore, must be suppressed.[1]

Following an evidentiary hearing on July 6, 2010, and subsequent receipt of the transcript of that hearing, the parties filed their initial briefs.  Defendant then sought and received two extensions of time to file a reply.  That brief was ultimately filed on November 24, 2010, and the matter was submitted to the undersigned for a ruling on that date.  After review of the transcript, briefs of the parties and applicable law, for the reasons given below, it is **RECOMMENDED** that the Motion [17] be **DENIED.**

---

[1] In the Motion Defendant also suggests that he may not have been advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966) or may not have understood them.  The only evidence introduced at the hearing on the Motion was that: Defendant was advised of his Miranda rights in English on two different occasions; spoke English; advised that he did not need an English to Spanish interpreter, and understood his rights.  Transcript of Hearing held July 6, 2010 (hereinafter Tr.) at pages 169 - 184; Government Exhibits 9 and 12.  In his post hearing briefs Defendant did not contend that he was not advised of his Miranda rights or that he did not understand them. Accordingly, in light of the evidence and Defendant's failure to brief the issue, the Court finds that, if the Motion included the contentions that Defendant's statements should be suppressed because he was not advised of his Miranda rights or because he did not understand those rights, those contentions are found to be without merit and, in any event, to have been abandoned.

## FINDINGS OF FACT

1.  Defendant arrived at the Atlanta Airport on a flight from Guadalajara, Mexico shortly after 1:00 p.m. on January 24, 2010.  Tr. at 11, 21, 140, 145.  When he came through customs he was referred to "Baggage Secondary" where he encountered Avita Ejiogu, a United States Customs and Border Protection ("CBP") Officer who was charged with searching the luggage of passengers referred to her section. Tr. at 11-12.[2]

2.  Before searching Defendant's luggage Officer Ejiogu reviewed his travel documents and ran a criminal history check.  She found that he had a criminal history consisting of charges for narcotics possession, domestic violence and other matters. Tr. at 13-14.  She then asked, and Defendant confirmed, that he owned the luggage that she was going to search.  Officer Ejiogu then searched Defendant's luggage and found four carved wooden objects,[3] which she thought to be heavier than she would have expected.  As a result, Officer Ejiogu had Defendant's luggage x-rayed and

---

[2]  Since Defendant is not contesting the legality of his being referred to Secondary and having his luggage searched, and because such routine searches at points of entry into the country are not subject to the need for reasonable suspicion, probable cause, or a warrant, United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985), the reasons why Defendant was selected for additional review before being admitted into the country are not relevant.

[3]  A single statue or figurine and three framed wooden carvings.  See, Government Exhibits 1-5.

3

discovered "anomalies" in the wooden objects.  Tr. at 18, 20.  Suspecting that these "anomalies" represented contraband, Officer Ejiogu alerted her supervisor and had the objects taken to a processing room where they could be drilled to determine the cause of the anomalies that appeared in the x-rays.  Tr. at 23.  When the wooden objects were drilled a white crystalline substance was found in each; the substance was tested and identified as methamphetamine.  Tr. at 24.

3.  After the x-ray anomalies were detected the Defendant was handcuffed, patted down[4] for weapons and taken to a holding cell, or the "search room."  Tr. at 36-37; 47.

4.  Defendant entered the search room at 1:52 p.m, Tr. at 91, approximately 50 minutes after his flight had arrived at the Atlanta Airport at 1:04 p.m. Tr. at 145.  In the search room  Defendant was subjected to a more thorough pat down aimed at locating contraband.  None was found, but the officer conducting the pat down reported that he could not get a good feel for what may be covered by Defendant's

---

[4] Officer Ejiogu recalled that CBP Officer Thompson conducted an immediate pat down for weapons at this time, Tr. at 35-36, but Officer Thompson had no recall of patting down Defendant while he was in Secondary.  Tr. at 88.  In any event, if it occurred, nothing was found during this immediate pat down, and whether Officer Thompson did or did not conduct an initial limited pat down proves to be of no moment to the resolution of the Motion.

4

pants and requested to proceed to the next stage and do a strip search of that area of Defendant's body. Tr. at 235. Chief Pugh, the Chief CBP Supervisory Officer at the Atlanta Airport, then authorized the partial strip search of the Defendant. Tr. at 57. A partial strip search does not require the removal of all clothes, but only the removal of the clothes covering that part of the body which the officers think could not be conclusively searched by a pat down. Tr. at 245-246. In this case Defendant was not required to remove his shirt or to step out of his pants and underwear. Instead he was asked to pull down his pants and underwear to his knees and to lean over to allow visual inspection of his buttocks area. Tr. at 59-60. During the partial strip search Defendant was not handcuffed or restrained in any way; he was not physically touched or photographed; he was not made any promises or subjected to threats, insults, derision, force or shows of force. He was partially nude, with his pants and underwear down to his knees for 30 seconds. Tr. at 61- 62. No contraband, or evidence of concealed contraband was found as a result of this partial strip search. Tr. at 60. The pat down and partial strip search took approximately eight minutes; Defendant left the search room and was taken to a holding room at 2:00p.m. Tr. at 91.

5. Chief Pugh testified that he authorized the partial strip search because the suspect was carrying contraband in his luggage. To his mind, that alone provided the

5

reasonable suspicion necessary to conduct a partial strip search.  He testified that it was his experience that when narcotics were found in luggage or other areas it was not unusual to find drugs on the body of the person who possessed the luggage in which the narcotics had been found.  Tr. at 235-236.  Chief Pugh has been in law enforcement as a customs officer for 23 years.  He has been the Chief Supervisory Officer for the CBP at the Atlanta Airport for seven years; he had been a Supervisor for ten years before being named Chief, and he was an Officer Inspector for four years before becoming a Supervisor.  Tr. at 228.

6.  At no time during or after the partial strip search on January 24, 2010, did Defendant complain about the search or appear either angry or distressed . Tr. at 62-63, 104-106.

7.  After Defendant was searched he was moved from the search room to a CBP holding room.  About an hour later Defendant was still in that holding room when he first met with personnel from the Immigration and Customs Enforcement Agency ("ICE"),  Officers Hoopingarner and Ford.  Tr. at 91, 130; Government Exhibit 9. They had not been in the search room when Defendant was patted down and partially strip searched and they were not aware before or after they met with  Defendant on January 24, 2010, that he had been subjected either to a pat down or a partial strip

search.  Tr. at 158-159, 185, 203-205.  They identified themselves to Defendant and read him his <u>Miranda</u> rights, after which he agreed to speak to them.  They asked Defendant whether he would participate in a controlled delivery of the drugs found in his luggage, and he declined, saying, in essence that if he did "they" would kill him. Tr. at 126-128.  During this interview and his later interviews with the ICE officers, Defendant never asked for his rights to be read in Spanish or for an interpreter to assist him; he never indicated in any way that he did not understand his rights or the officer's questions; he never asked for a lawyer; he was not restrained in any way, and the officers did not threaten him, make promises, brandish their weapons or make any show of force.  Tr. at 127-132.

8.  Immediately after Defendant declined to participate in a controlled delivery, he was taken by the ICE agents from the CBP holding room to the ICE office, which was just a few minutes away.  Tr. at 172.  There he was asked whether he wanted a copy of his rights in Spanish; he declined and was given a copy of the ICE form statement of <u>Miranda</u> rights in English.  He was again read his <u>Miranda</u> rights, and this time he was asked whether he understood each right as read.  He indicated he did and as evidence thereof placed his initials beside each listed right on the printed ICE statement of rights form.  Defendant then initialed the form in the "yes" box following the

7

questions: "Do you understand your rights?" and "Do you wish to waive your rights?"

Tr. at 136-138, 179-180; Government Exhibit 12.  This process was completed at 3:10

p.m., approximately ten minutes after Defendant first encountered the ICE officers.

Tr. at 141, 181; Government Exhibit 12.

9.   After signing the written waiver of his Miranda rights, Defendant gave an

inculpatory statement, admitting to attempting to bring drugs into the country and

repeating much of what he had said after he first met the ICE agents at the CBP

holding cell.   Tr. at  140-141; Government Exhibit 9.[5]

10.  As was the case with Defendant's contact with the CBP officers, see Finding of

Fact (hereinafter "FOF") 4,  at no time during the Defendant's encounters with the

ICE officers on January 24, 2010, or thereafter, was Defendant subjected to any

threats, promises, shows of force or actual force.  Tr. at 147, 174-175, 177-178, 184.

He never complained about his treatment by the CBP or ICE officers, Tr. at 149,

175,185, and at no time did he appear to be traumatized in any fashion.  Tr. at 212.

---

[5] Subsequently, while being transported from the Atlanta Airport to the Atlanta
City Detention Center, Defendant made some other statements that might be
inculpatory.  These statements, however, were not made in response to interrogation
and, in any event, were made after Defendant had twice received Miranda warnings
and had waived his rights. Tr. at 195.  Defendant has not argued that these statements
should be suppressed for any reasons independent of the alleged taint of the partial
strip search.  Tr. at 217.

# **DISCUSSION**

A.  The Law Applicable To Border Searches.

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy.  U.S. Const. amend. IV;  United States v. Place, 462 U.S. 696, 706-07 (1983).  The reasonableness of a search is determined by weighing "its intrusion on [an] individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  Denson v. United States, 574 F.3d 1318, 1338 (11th Cir. 1981). However, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border[6] than in the interior." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).  Accordingly, at the border, "the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government."  United States v. Alfaro-Moncada, 607 F.3d 720, 728 (11th Cir. 2010) (citing Montoya de Hernandez, 473 U.S. at 539-40).

---

[6] The courts have determined that the United States' "international border" is not limited to its boundaries abutting oceans or neighboring countries, but is "elastic." United States v. Hill, 939 F.2d 934, 935 (11th Cir. 1991). "Places such as international airports within the country," then, are considered the "functional equivalent" of a border for Fourth Amendment purposes.  Id.

Due to the United States' strong interest in national self-protection and territorial integrity, "[r]outine searches of the persons and effects of [border] entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." <u>Montoya de Hernandez</u>, 473 U.S. at 538; <u>see also</u> <u>Alfaro-Moncada</u>, 620 F.3d at 728; <u>United States v. Flores-Montano</u>, 541 U.S. 149, 152 (2004).  Routine searches of luggage or pat-downs and frisks, for example, are "reasonable simply by virtue of the fact that they occur at the border." <u>Denson</u>, 574 F.3d at 1339; <u>see also</u> <u>Alfaro-Moncada</u>, 607 F.3d at 728.

Highly intrusive searches, however, such as a strip search, still require some level of suspicion at the border.  <u>See</u> <u>Brent v. Ashley</u>, 247 F.3d 1294, 1300 (11th Cir. 2001) (Fourth Amendment requires customs agents to have reasonable suspicion before conducting a strip search of an airline passenger arriving at Miami International Airport from Nigeria);  <u>Alfaro-Moncada</u>, 607 F.3d at 729, n.6 ("We have set that level of suspicion [for highly intrusive border searches] at reasonable suspicion.").

A "reasonable suspicion" requires "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant [an] intrusion." <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968).  What is a "reasonable suspicion" is determined from the totality of the circumstances, <u>United States v. Sokolow</u>, 490 U.S. 1 (1989).

Thus, for a strip search[7] at the border involving suspected drug smuggling, "the

standard . . . must be whether under the 'totality of the circumstances' an experienced

customs inspector would reasonably believe the traveler was carrying contraband."

United States v. Vega-Barvo, 729 F.2d 1341, 1350 (11th Cir. 1984).

B. The Partial Strip Search Of Defendant Was Based On A Reasonable Suspicion,

And Therefore, Was Lawful.

In arguing that the partial strip search in this case was not lawful Defendant

relies on United States v. Himmelwright, 551 F. 2d 991 (5th Cir. 1977)[8]; United States

v. Vega-Barvo, 729 F. 2d 1341    (11th Cir. 1984), and other like cases which have held

that the "reasonable suspicion" requirement "can only be met by a showing of

articulable facts which are particularized as to the person and as to the place to be

searched." Vega-Barvo at 1349 (citing Himmelwright at 995).  In the cases relied on

by Defendant, however, circumstantial evidence was deemed sufficient to support a

_____

[7] This case involves only a partial strip search of limited duration, but since the
Defendant was required to drop his pants and underwear and to expose his buttocks
the undersigned finds that he was subjected to an intrusive search requiring a
reasonable suspicion.

[8]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit
rendered prior to October 1, 1981.

strip search, or an x-ray.  In <u>Himmelwrite</u> the requisite reasonable suspicion was met by observations that: "she was a woman, traveling alone, wearing platform shoes... recently returning from a short stay in Colombia ... [who] gave evasive and contradictory answers when questioned about her employment." <u>Id</u>. at 996.  In <u>Vega-Barvo</u> that: "she was a South American traveling alone; she arrived from a drug-source country; she was carrying a single piece of poor quality luggage which 'contained mostly rags', she had no credit cards or checks ... she showed signs of extreme nervousness [and her answers to questions were] not credible" was deemed sufficient to warrant a finding of reasonable suspicion that a passenger was smuggling drugs internally so as to justify a search utilizing x-rays.  Id. at 1350.

In the present case, Defendant had some of the same characteristics that were deemed material in <u>Himmelwright</u> and <u>Vega-Barvo</u> to determine whether the requisite reasonable suspicion existed to perform an intrusive border search: he was traveling by himself, coming from a "source" country and, in addition, he had a record of at least one drug arrest.   But unlike the cases relied on by Defendant,  where relatively weak circumstantial evidence was deemed sufficient to support an intrusive border search, here there was also direct evidence that Defendant was a drug smuggler.  Specifically, methamphetamine was found hidden in his luggage.  That discovery,

alone, was enough in the vast experience of Chief Pugh, see FOF 5, to create a reasonable suspicion that Defendant may have been trying to smuggle more drugs on his person.  After a pat down for drugs was negative, Chief Pugh ordered a partial strip search of the area of the body where drugs could be hidden but could not be detected by a pat down; that is, below the waist and above the knees.  Chief Pugh is not alone in considering direct evidence of drug smuggling to create sufficient reasonable suspicion to justify a strip search.  Not only do the cases relied on by Defendant permit a strip search on very limited circumstantial evidence, but he has not pointed to one case, and the Court is not aware of any case, where direct evidence of drug smuggling - such as drugs found in a passenger's luggage - has not been deemed sufficient to provide the requisite suspicion for a strip search, much less a partial strip search, at an international border.

On the other hand, those cases in which such direct evidence existed have been uniform in holding that such evidence is sufficient to justify a strip search.  See United States v. Carter, 592 F.2d 402, 405 (7th Cir. 1979) (discovery of large quantities of cash in defendant's pockets justified further search into his clothing, which resulted in the discovery of more cash and heroin and justified strip search:  "[t]he discovery of incriminating matter during routine searches is 'reasonable cause to suspect' that

13

a more intensive search will produce more contraband"); United States v. Flores, 477 F. 2d 608, 609 (1st Cir. 1973) (discovery of undeclared emeralds in routine search justified strip search: "[t]he nature, location and profusion of the undeclared articles plainly suggested that defendant was consciously engaged in smuggling activities. It was only reasonable to suppose that more contraband might be found on his person."); United States v. Demurgas, 656 F. Supp. 1537, 1539 (E.D.N.Y. 1987) (discovery of unreported currency in defendant's luggage during routine search justified strip search: "[s]ince the fruits of the first search alone exceeded $10,000, in violation of federal law, the customs inspector was obviously justified in ordering that defendant be subjected to a body search").

The undersigned agrees with Chief Pugh and the decisions of the other courts that have addressed the issue which are discussed above. The discovery of illegal drugs during a routine border search of luggage creates a reasonable suspicion that the individual bringing that luggage into the country is a drug smuggler. With such evidence it would, in fact, be unreasonable for a border officer to cease his investigation. As Chief Pugh testified, see FOF 5, and as ICE officer Ford concurred, Tr. at 208, once smuggled drugs are found in one location they are likely to be found in another. By having illegal drugs in his luggage, Defendant gave the officers at the

border reason to believe he was a drug smuggler, and thus the requisite reasonable suspicion and particularized evidence to justify a thorough pat down, and thereafter a more invasive, but still limited, strip search of that part of Defendant's body that could not adequately be searched by a pat down.  As a consequence, the partial strip search of Defendant did not violate his rights under the Fourth Amendment to the United States Constitution.

C.  Defendant's Statements Should Not Be Suppressed.

Defendant argues that his statements to ICE officers on January 24, 2010 should be suppressed because: (1) they were "tainted" by the illegal strip search, and (2) the strip search was coercive and made all subsequent statements involuntary.

1.  The statements were not "tainted" by the partial strip search.

Because, for the reasons above, the Court finds that the partial strip search was lawful, there is no "taint" from an illegal search that would justify suppression of subsequent statements.  Even if the partial strip search were found unlawful, because nothing was found as a result of that search that led to the statements, there is no "fruit" from the poisonous tree to suppress.  As the Eleventh Circuit has said: "[a]ssuming the primary illegality can be established 'the exclusionary rule applies not

15

only to the illegally obtained evidence itself, but also to other incriminating evidence **derived** from the primary evidence.'" <u>United States v. Terzado-Madruga</u>, 897 F. 2d 1099, 1112-1113 (11th Cir. 1990)(emphasis added, citations omitted).

Here, there was no illegal search but, even if there was, the exclusionary rule would have  no application because nothing was "derived" from that search.  Further, there is no evidence that the officers "exploited"the partial strip search to obtain the statements.  Different officers, who were not even aware of the partial strip search, conducted the interrogation and obtained the statements; the statements were given approximately one hour after the strip search; there is no evidence that the officers conducting the interrogation tried to trick, coerce or intimidate Defendant in any way. In fact, it was quite the opposite, and Defendant was read his <u>Miranda</u> rights twice, he indicated he understood them and he waived those rights before he made any incriminating statements.  <u>See</u> FOF 7, 8  and 10.   Under such circumstances there is no basis to argue that the officers "exploited" the partial strip search to obtain the statement, and therefore, even if the partial strip search had been illegal (which it was not), there is no basis to find that it "tainted" the statements so as to require their suppression.  <u>See</u>  <u>United States v. Hill</u>, 338 Fed Appx. 855, 858 (11th Cir. 2009).

16

Thus, Defendant's statements should not be suppressed on the ground that they were "tainted" by the partial strip search.

Defendant also argues that his inculpatory statements were "tainted" by the partial strip search because it was so intimidating or coercive that his subsequent statements were derived from that intimidation and coercion, and thus, involuntary. That argument, however, is indistinguishable from his contention, addressed below, that his statements should be suppressed because they were not given voluntarily.

2. <u>The statements were voluntary</u>.

As noted above, Defendant gave his statements after having been read his <u>Miranda</u> rights on two occasions, with a copy of those rights (in English) before him on the second occasion.  He indicated he understood his rights; he was offered the opportunity to read his rights in Spanish, but he declined and never asked for his rights to be read in Spanish; his answers to the questions posed by the officers indicated to them that he understood his rights; while he was questioned in an ICE office with two officers present, he was not handcuffed or restrained in any way; neither officer displayed a weapon or made any show or use of force; no threats or promises were made in order to obtain Defendant's statements; he did not complain about the partial

17

strip search or any other condition or treatment to which he had been exposed,  and he did not appear to be "traumatized" in any way .  See FOF 7, 8 and 10.  Not only is there no evidence in the record to establish that Defendant's statements were involuntary, but  all evidence establishes the contrary.

The only evidence Defendant points to in support of his contention that his statements were involuntary is the partial strip search.  He argues that it was so intimidating that his subsequent statements were involuntary.  As discussed above, since the search was lawful it cannot be the basis for invalidating subsequent statements. Even assuming that the partial strip search was not lawful, however, there is no evidence that it affected Defendant in any way.  He did not complain of the search; it occurred slightly more than an hour before he was given his Miranda warnings and made inculpatory statements; different officers were involved and their observation was that Defendant did not appear not traumatized by the day's events. See FOF 7, 8 and 10.  Accordingly, there is no basis for finding Defendant's statements involuntary and suppressing them on that ground.

## RECOMMENDATION

For all the above reasons, the undersigned **RECOMMENDS** that Defendant's Motion [17 ] be **DENIED.**

**IT IS SO RECOMMENDED** this 23rd day of December, 2010.

_____
C. CHRISTOPHER HAGY
UNITED STATES MAGISTRATE JUDGE