FILED IN CHAMBERS
U.S.D.C. - Atlanta

MAR 07 2011

James N. Hatten, Clerk
By: [signature]
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARLOS LAUREANO-CASTELLON | CRIMINAL CASE NO.<br>1:10-CR-083-ODE-CCH |

ORDER

This criminal case is before the Court on Defendant Carlos Laureano-Castellon's ("Defendant") objections [Doc. 41] to the Report and Recommendation ("R&R") issued by Magistrate Judge C. Christopher Hagy [Doc. 38]. Magistrate Judge Hagy recommends that Defendant's Motion to Suppress Statements [Doc. 17] be denied [Doc. 38]. Magistrate Judge Hagy also certified the case ready for trial [Doc. 37]. For the following reasons, the Court ADOPTS the R&R [Doc. 38], Defendant's objections to the R&R [Doc. 41] are OVERRULED, and Defendant's Motion to Suppress Statements [Doc. 17] is DENIED.

I.   Factual Background

On January 24, 2010, shortly after 1:00 p.m., Defendant arrived at the Atlanta Airport on a flight from Guadalajara, Mexico [Suppression Hr'g Tr. at 21]. When he went through United States Customs, he was referred to Baggage Secondary, where Avita Ejiogu, the United States Customs and Border Protection ("CBP") Officer on duty, was assigned to inspect his documents and luggage [Tr. at 12-13]. Officer Ejiogu first reviewed Defendant's travel documents and ran a criminal history check and found Defendant had a prior criminal arrest involving narcotics possession [Tr. at 13-

14]. She then asked Defendant to verbally declare which bags where his and indicate whether all of the items in the identified bags belonged to him [Tr. at 14]. Officer Ejiogu opened Defendant's bags and found three picture frames and a figurine which all felt heavier than she would have expected [Tr. at 14-16].

As a result, Officer Ejiogu had Defendant's luggage x-rayed and unidentified objects were detected within the picture frames and the figurine [Tr. at 16-18]. Officer Ejiogu alerted her supervisor, who had the objects taken to a processing room where they were drilled; small rectangles of a white crystalline substance were found in each object [Tr. at 20-24]. The substance was tested and identified as methamphetamine [Tr. at 24]. Defendant was handcuffed, patted down for weapons and taken to a holding cell located next to the processing room [Tr. at 20-24]. Officer Ejiogu testified that Defendant was quiet and did not evoke any emotions [Tr. at 23].

Once Defendant was in the holding room, at around 1:52 p.m., Officer Thompson received permission from the supervisor on duty to conduct a pat down of Defendant [Tr. at 87-91]. At no point did any officers show a weapon or restrain Defendant beyond the use of handcuffs [Id.]. Officer Thompson directed Defendant to remove everything from his pockets, remove his shoes, remove his belt, place his hands up on the wall, and spread his legs; Officer Thompson then immediately conducted a pat down, including a groin search [Tr. at 94-96]. Then, under the direction of Chief Pugh, the Chief CBP Supervisory Officer at the Atlanta Airport, Officer Thompson completed a partial strip search; he asked Defendant to

lower his pants and underwear, bend over, and spread his buttocks [Tr. at 99-102]. Chief Pugh testified that he authorized the partial strip search because, due to the pants Defendant was wearing, Officer Thompson could not fully search Defendant's groin area, and because Chief Pugh had a suspicion that because narcotics were found in Defendant's luggage, Defendant could have been transporting narcotics in other areas of his body [Tr. at 234-35]. Chief Pugh also testified that it was his experience that when narcotics were found in luggage, it was not unusual to find drugs on the body of the person who possessed the luggage in which the narcotics had been found [Tr. at 235-36].

At no point of the partial strip search did Officer Thompson or anyone else touch Defendant, nor was he restrained in any way [Tr. at 102-03]. Defendant was not asked to remove any other portions of his clothing or step out of his pants [Tr. at 99-102]. Defendant did not complain about the search or appear either angry or distressed [Tr. 62-63]. No contraband or evidence of concealed contraband was found as a result of the pat down or the partial strip search, and Defendant was taken to a separate holding room approximately eight minutes later at 2:00 p.m. [Tr. at 91-106].

About an hour after Defendant was moved to the separate holding room, Defendant met with Officer Hoopingarner and Officer Ford from the Immigration and Customs Enforcement Agency ("ICE") [Tr. at 130]. Neither officer had been in the search room nor were they aware that Defendant had been patted down or partially strip searched [Tr. at 132-33, 158-59]. Both officers identified themselves and showed Defendant their badges [Tr. at 126]. After asking Defendant whether he spoke English and whether he wanted a

3

Spanish interpreter (which Defendant declined), Officer Hoopingarner read Defendant his <u>Miranda</u> rights [Tr. at 126-27]. Defendant responded that he understood the rights and that he wished to speak with the ICE officers without a lawyer [Tr. at 127-28]. During the time Defendant was speaking with the ICE officers, Defendant never asked for a lawyer, never indicated that he did not understand his rights, and never asked for an interpreter to assist him [Tr. at 127-32]. Officer Ford and Officer Hoopingarner asked Defendant whether he would participate in a controlled delivery of the drugs found in his luggage, which Defendant declined, saying the recipients would kill him if he participated in a controlled delivery [Tr. at 128].

After the encounter with Defendant in the CBP holding room, Officer Ford and Officer Hoopingarner escorted Defendant to the ICE office within the Atlanta Airport [Tr. 133-36]. Once in the ICE office, the officers gave Defendant a written form of his <u>Miranda</u> rights, which Defendant initialed line by line, indicating that he understood each line, and then signed a written waiver of his <u>Miranda</u> rights [Tr. at 138-39]. Defendant then gave an inculpatory statement, admitting that he had been given a suitcase in Guadalajara, Mexico to transport to Atlanta, and that he knew that the suitcase contained narcotics, but he did not know what type or how much [Tr. at 140]. During the interview, which lasted no more than a half hour [Tr. at 141], Defendant was not handcuffed or otherwise physically restrained, neither officer drew a weapon, and neither officer made any threats or promises to the Defendant [Tr. at 147-48]. Defendant did not complain about the questioning or mention that he had been patted down and

4

stripped searched by the CBP officers [Tr. at 148-49]. Defendant was then briefly placed in a holding cell and subsequently transported to the A.C.D.C. detention facility [Tr. at 149-51].

II. <u>Procedural History</u>

On February 24, 2010, a federal grand jury sitting in the Northern District of Georgia charged Defendant with two counts of knowingly and intentionally importing a mixture and substance containing a detectable amount of methamphetamine into the United States from Mexico, in violation of 21 U.S.C. §§ 952(a), 960(a), 960(b)(3), 963 and 18 U.S.C. § 2; and two counts of knowingly and intentionally possessing with the intent to distribute a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(C), 846, and 18 U.S.C. § 2 [Doc. 6]. After entering a plea of not guilty to all four counts before Magistrate Judge Linda T. Walker on March 3, 2010 [Doc. 10], Defendant filed a Motion to Suppress Statements on March 31, 2010 [Doc. 14]. Defendant's Motion to Suppress Statements was withdrawn on April 23, 2010 [Doc. 15], and reinstated on May 24, 2010 [Doc. 17].

Magistrate Judge Hagy held a suppression hearing on July 6, 2010 [Docs. 24 and 29]. Upon receipt of the transcript of the suppression hearing, Defendant filed a post-hearing brief to support his Motion to Suppress Statements [Doc. 31] and the government responded in opposition to Defendant's Motion to Suppress Statements [Doc. 32]. Defendant sought and received an extension of time to file a reply and on November 24, 2010 defended his Motion to Suppress Statements in reply [Doc. 36]. Magistrate Judge Hagy entered the R&R, recommending that

5

Defendant's Motion to Suppress Statements be denied, on December 23, 2010. Pursuant to 28 U.S.C. § 636(b)(1), the parties were granted fourteen (14) days from the entry date of the R&R to file any written objections to the R&R; Defendant filed the instant objections on January 7, 2011.

III. Discussion

    A. Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1), the Court must conduct a <u>de novo</u> review of those portions of the R&R to which Defendant has timely and specifically objected. The Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); <u>United States v. Raddatz</u>, 447 U.S. 667, 673-74 (1980). The portions of the R&R to which Defendant offers no specific objection, will be assessed for clear error only. <u>See</u> <u>Tauber v. Barnhart</u>, 438 F. Supp. 2d 1366, 1373 (N.D. Ga. 2006)(Story, J.)("[I]ssues upon which no specific objections are raised do not so require <u>de novo</u> review; the district court may therefore 'accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,]' applying a clearly erroneous standard.") (quoting 28 U.S.C. § 636(b)(1)).

Defendant has made no specific objections to the R&R. Instead, Defendant states in his objections that he "objects to both the factual and legal conclusions made in the R&R." [Doc. 41]. To support his general objections, Defendant does not cite to any specific argument or law, but "reiterates, relies on, and incorporates by reference all of his factual allegations and legal conclusions in his briefs filed in this matter." [<u>Id.</u>]. Because

6

Defendant has made no specific objections to the R&R, the Court will review the R&R for clear error only. <u>Tauber</u>, 438 F. Supp. 2d at 1373.

    B.   <u>Search of Defendant's Luggage and Partial Strip Search of Defendant</u>

The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. "The Fourth Amendment's prohibition against unreasonable searches and seizures protects an individual in those places where [he] can demonstrate a reasonable expectation of privacy against government intrusion . . . ." <u>United States v. King</u>, 509 F.3d 1338, 1341 (11th Cir. 2007)(internal quotation marks and citation omitted). However, "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 538 (1985). In <u>Montoya de Hernandez</u>, the Supreme Court held, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." <u>Id.</u>

Here, Defendant entered the United States from Mexico at the Atlanta Airport, an international border. Thus, Magistrate Judge Hagy did not clearly err in determining that the routine search of Defendant's luggage and subsequent pat down of Defendant upon his entrance into the United States from Mexico was proper.

Highly intrusive strip searches, on the other hand, require reasonable suspicion and a showing of a particularized and

7

objective basis for suspecting the traveler is concealing contraband internally. Id. at 541-42; Denson v. United States, 574 F.3d 1318, 1341 (11th Cir. 2009). The Eleventh Circuit has held that reasonable suspicion to justify a strip search at a border "can only be met by a showing of articulable facts which are particularized as to the place to be searched." Brent v. Ashley, 247 F.3d 1294, 1304 (11th Cir. 2001)(internal quotation marks and citation omitted).

Here, CBP Officers had found narcotics concealed in four different objects contained in Defendant's luggage, Defendant had a record of at least one drug-related arrest, and Defendant was traveling from a known source country. These circumstances alone are sufficient to establish reasonable suspicion that Defendant was transporting narcotics in his body. CBP Chief Pugh also testified that in his experience working for CBP, when narcotics were found in luggage, it was not unusual to find drugs on the body of the person who possessed the luggage in which the narcotics had been found. Therefore, Magistrate Judge Hagy did not clearly err in concluding that the CBP officers had the requisite reasonable suspicion and particularized evidence to justify a limited strip search of that part of Defendant's body that could not adequately be searched by a pat down; the partial strip search of Defendant did not violate his Fourth Amendment rights.

    C.   <u>Defendant's Statements Made to ICE Officers</u>

Under the "fruits of the poisonous tree" doctrine, if the government has violated any of Defendant's constitutional rights in obtaining evidence, the exclusionary rule would apply "not only

8

to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." Nix v. Williams, 467 U.S. 431, 441 (1984). Verbal evidence, such as any statement made by Defendant, derived from the government's illegal conduct would also fall under the exclusionary rule. Wong Sun v. United States, 371 U.S. 471, 485 (1963). As discussed above, the partial strip search of Defendant was reasonable and did not violate Defendant's constitutional rights. Thus, Magistrate Judge Hagy did not clearly err in finding that Defendant's statements made subsequent to the strip search were not "tainted" by the strip search and are not subject to suppression on "fruits of the poisonous tree" grounds.

Determination of the admissibility of a custodial confession or statement requires a two-part inquiry: (1) the Court must determine whether the ICE officers complied with the requirements of Miranda; and (2) the Court must determine whether Defendant's statements were voluntary. United States v. Bernal-Benitez, 594 F.3d 1303, 1317-18 (11th Cir. 2010); United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994). Defendant received oral Miranda warnings in English from the ICE officials before he made a statement in the CBP holding room. Defendant also received written Miranda warnings in English from the ICE officials before he gave statements in the ICE office. The ICE officials ascertained that Defendant spoke English; asked Defendant repeatedly whether he would prefer to have a Spanish translator, which Defendant refused; and verified that Defendant understood the Miranda warnings. In the ICE office, Defendant initialed next to each separate Miranda warning to certify his understanding of

each element. At no point did Defendant express confusion or request an attorney or a translator. Defendant was not physically restrained in any way, the ICE officers never displayed a weapon, no promises or threats were made in order to obtain Defendant's statements, Defendant did not complain about any elements of the search and subsequent questioning to which he had been exposed, and Defendant did not appear traumatized in any way. Nothing in the record suggests that Defendant's statements were not knowing, intelligent, and voluntary.

Defendant's argument that the partial strip search was so intimidating that his subsequent statements were involuntary fails. At no point did Defendant appear as though he had been physically or mentally affected by the partial strip search. He never objected and complied with every request made by CBP and ICE officers. Additionally, the partial strip search occurred more than an hour before he was given his <u>Miranda</u> warnings and subsequently made inculpatory statements. Magistrate Judge Hagy thus did not clearly err in finding that the ICE officials complied with the requirements of <u>Miranda</u> and Defendant's statements were voluntary; there is no basis to suppress Defendant's inculpatory statements.

IV. <u>Conclusion</u>

Having reviewed the R&R and Defendant's objections thereto, and for the foregoing reasons, the Court ADOPTS the R&R [Doc. 38], Defendant's objections to the R&R [Doc. 41] are OVERRULED, and Defendant's Motion to Suppress Statements [Doc. 17] is DENIED.

SO ORDERED this  7  day of March, 2011.

                                                        _____
                                                        ORINDA D. EVANS
                                                        UNITED STATES DISTRICT JUDGE